[No. 21846.  Department Two.  December 16, 1929.]

JAMES LINDSEY, *Respondent*, v. LAURA BARBARA ELKINS, *as Administratrix, Appellant*, IRVING T. SIDEL *et al., Defendants*.[1]

[1]Reported in 283 Pac. 447.

*Pearson & Potts,* for appellant.

*Stanley J. Padden* and *George F. Ward,* for respondent.

MILLARD, J.—This is an action to recover for personal injuries sustained in a collision of three automobiles. From the judgment rendered on the verdict in favor of the plaintiff and against the defendants J. E. Elkins and Irving T. Sidel, the defendant Elkins alone appeals.

J. E. Elkins died subsequent to his appeal, and his widow, executrix of her deceased husband's estate, has been substituted as appellant herein.

Three automobiles were involved in the collision, which occurred on the Bothell highway north of Seattle on July 4, 1928, at one-thirty a. m. The night was dark, with rain and mist obscuring the visibility. The course of the highway, which is of concrete and twenty-seven feet wide, is northerly and southerly. The respondent was riding on the front seat as a guest in an automobile operated and owned by Owen Flannigan. That car was traveling in a southerly direction at a speed of thirty to thirty-two miles an hour until within fifty to seventy-five feet of the cars with which it collided. The Sidel automobile was headed south and was parked with all four wheels on the highway, the car standing two or three feet east of the west edge of the pavement. No lights were burning on the Sidel car. The Elkins car was also proceeding in a southerly direction. It drove alongside of, or parallel with, the Sidel car, and stopped. Appellant denies that his car stopped, his testimony being that his car was in motion when struck. However, there is evidence which the jury doubtless believed, that the Elkins' car stopped on the highway parallel with, and five feet east of, the Sidel car.

From the point of the accident for a distance of two hundred and seventy feet to the north, the road is straight; thence northward is a long curve of one degree and thirty minutes. The pavement is almost

level. On the east side of the highway at the scene of the accident, the land falls away abruptly, and fourteen inches east of the edge of the pavement, is a barrier or fence next to the road. On the west side of the highway, there is a ditch and a high bank. On a clear day one standing in the center of the highway at the place of the collision could see a car one thousand feet to the north.

The tail light of the Elkins car was first seen by the driver of the Lindsey car when about two hundred feet distant. At that time the Lindsey car was traveling at the rate of approximately thirty miles an hour. The parked Sidel car was discovered by the operator of the Lindsey car when distant therefrom fifty to seventy-five feet. The Lindsey car was slowed to a speed of fifteen to eighteen miles an hour and turned out to go around the Sidel car. The tail light of the Elkins car was then discernible but the Lindsey driver "could not see that the tail light wasn't moving." When thirty feet distant, discovering the Elkins car was stopped, the brakes of the Lindsey car were applied, but the Lindsey car skidded, colliding first with the Elkins car and then with the Sidel car. It was testified that the brakes of the Lindsey car had been adjusted two weeks previously and "were absolutely in good shape."

On direct examination the driver of the Lindsey car testified:

" . . . I first saw the Elkins' car before the curve; that is the north end of the curve. I found it about 200 feet down the highway. I saw its tail light all the time. The night was rainy and misty and pretty hard to see but I could follow the tail light down. I did not see the Sidel car at all on the road. The Elkins car was directly ahead of me. I was driving on my own side of the road about two feet from the edge. The Elkins car was on the right-hand side

just as I was. As I came around the turn I noticed the Elkins' car had pulled out until it was just about straddling the middle of the road a little to the left side. That was when I came to the end of the turn. As far as I know the car was about 200 feet ahead of me. It was impossible that night to tell how far that tail light was ahead of me. I could see just a glow because the night was extremely rainy and misty. My head lights were burning brightly. The rain greatly reduced the distance that any object could be seen. The rain, coming against the lights on the car would cut it away down. I would say that I could see ahead about fifty feet. Q. Now had the Elkins' car pulled out into the center of the road when it was 200 feet from the end of the curve? A. I believe it was. It was pulling out there. It is hard to tell distance in a rain like that. Q. So then as you came down there and the Elkins' car had come out into the middle of the road, you could tell that by the tail light being over on one side? A. Absolutely. I maintained my position and kept coming along so that when I was about 50—75 feet I kind of saw an object, something kind of dark, it loomed up ahead of me. It was in front of me on my side of the road. This was the Sidel car. I just saw something on the road. When I saw it, I turned out gradually and as I did that I slowed down. I wasn't driving over thirty miles an hour. I turned out a little to the other side and kept by the Sidel car. I first realized that it was a car when my headlights showed it up. There was absolutely no light on the rear of the Sidel car. When I pulled out, I saw that Elkins' car was stopped there. Jimmie was sitting beside me—rather on the outside there, and hollered, 'that car—those two cars are stopped.' At that time I was turning out and was going about 15 miles to 18 miles an hour. I could not tell before that that the Elkins' car had stopped and it was utterly impossible to tell whether it had stopped or not until I was almost on top of it. The glow of the tail light was low at all times. My own lights disclosed to me that it had stopped. Coming down the road my headlights were pointing ahead and when I

turned they would point more towards the Elkins' car. I grabbed everything and threw on the brakes and threw the wheel hard over. I then hit the Elkins' car in the rear. I hit the Elkins' car first. Those two cars were absolutely even at the time of the impact. The Elkins' car was astride the center of the road. Sidel's car was parked on the road, all four wheels on the road, two or three feet from the edge. There was a space between Sidel's car and Elkins' car.''

On cross-examination, the driver of the Lindsey car testified:

''A. My car had very good four-wheel brakes. This was a wet concrete pavement. I had followed the car (Elkins) about 200 feet, for some time. I saw the rear light all the time and the Elkins' car pulled out to pass something and I saw its tail light then. . . . I did not see the rear end of the car until I was about fifty feet from it. Q. And that was the time you saw the Auburn car—the Sidel car? A. Yes, at the same time. Q. What did you do then? A. I threw on my brakes but it took a short length of time before I could get into action. When I did, there was nothing to do but try to stop, so I threw on my brakes. Q. You say you saw these cars first about fifty or seventy-five feet away—you testified in direct examination? A. Yes. Q. And you put on your brakes as soon as you could? A. As soon as I could. Q. And how far were you away from those cars when you put your brakes on? A. About thirty feet. Q. And the brakes took, did they? A. Yes, the brakes held, but on a slippery pavement. Q. Did you lock your wheels? A. I presume so, surely. Q. And you slid thirty feet with all four wheels locked? A. I presume so.''

The testimony supporting appellant's contention is that his car slowed to about fifteen miles an hour and was attempting to pass around to the left side of the Sidel car; that, while passing the Sidel car, the appellant heard a crash from the rear, the Lindsey car first striking the Sidel car, and immediately there- after a slight bump on the rear bumper of the appel-

lant's car. The Lindsey car crashed into the Sidel car throwing it off the highway into the ditch and ahead twenty-five or thirty feet. The respondent was thrown from the car in which he was riding when the Lindsey car struck the Sidel car.

The verdict of the jury indicates that they believed the evidence that the Elkins car stopped five feet east of and parallel with the Sidel car, which was without lights and parked two or three feet east of the west edge of the pavement; that the Sidel car and the Elkins car are each approximately six feet wide; that a clearance of seven to eight feet remained on the east side of this twenty-seven foot highway. The verdict also reflects the acceptance by the jury as true the evidence that the Lindsey car was proceeding at thirty miles an hour until within fifty feet of the barricade, when the speed of the car was reduced to fifteen to eighteen miles an hour and that, when thirty feet distant from the standing cars, the brakes were applied, but the Lindsey car was unable to stop on the wet, slippery pavement.

Appellant first complains that the court erred in receiving the verdict. Counsel for the parties agreed upon a sealed verdict. The court told the jury:

"The counsel in this case have agreed that it will not be necessary to bring some of you back from your homes when you agree upon a verdict, and I will explain again how to make that verdict. You will find for the plaintiff against all defendants, or you will find in favor of all defendants and against the plaintiff, or you will find for the plaintiff against some defendant. You make the form of verdict say what you find. If you find for the plaintiff against all defendants, say so; if you find against some defendants, state which ones you find against, and then state your finding in favor of the others. But ladies and gentlemen, so that you would not have to come back here Monday, I wish you would—and counsel consent that you may—and they

have a right to know how you stood—you indorse on your verdict whether the verdict was unanimous as to all the defendants, or ten to two. It takes ten, you know. So that if it should be unanimous as to some and ten to two as to others put that on there. I am sure you will understand. Then when you agree, the following are excused permanently: (eight were excused). The following jurors (naming them) Those four report Monday morning. . . . And when you agree on your verdict, seal it up, indorsing on it just how you stand as to the different ones, and give it to the bailiff, who will bring it into court tomorrow morning."

The verdict of the jury reads as follows:

"We, the jury in the above-entitled cause, do find for the plaintiff in the sum of three thousand five hundred dollars ($3,500), of which two thousand dollars is assessed against Irving T. Sidel and fifteen hundred dollars ($1,500) is assessed against J. E. Elkins."

On the line below, appears "Dollars ($3,500)."

The following notation was upon the verdict:

"Harry & George Sidel, jointly responsible No 11, Yes 1. Irving Sidel responsible Yes 12. Elkins jointly responsible Yes 10 No 2. Final verdict 10—2."

Judgment was entered against Sidel and Elkins for thirty-five hundred dollars.

Counsel for appellant argue that the jury did not intend to find against Elkins in any sum greater than fifteen hundred dollars, and for this irregularity in the verdict, the court should have granted a new trial in view of the fact that the verdict was a sealed verdict, not opened until the following Monday, thus depriving the court of any opportunity of sending the jury back to correct the verdict. It is insisted that, under the provisions of the statute,

"If the verdict is informal or insufficient it may be corrected by the jury under the advice of the court,

or the jury may again be sent out,'' Rem. Comp. Stat., § 360,

only the jury could correct the verdict; that it was impossible for the jury to make the correction as the verdict was a sealed verdict and the jury excused, therefore the court had no alternative but to grant a new trial.

That the defendants are jointly liable, is manifest. Whether the attempt by the jury to segregate or apportion the damages should be disregarded as surplusage is not an open question in this state. *Pearson v. Arlington Dock Co.,* 111 Wash. 14, 189 Pac. 559.

Counsel for appellant argue that, from the physical facts, it is impossible that the plaintiff could have been thrown out at any time other than when his car hit the Sidel car, therefore the slight touch occurring when the Lindsey car struck the Elkins car could have done injury to no one, and that the case at bar is controlled by *Young v. Dille,* 127 Wash. 398, 220 Pac. 782.

The position of appellant is not tenable. There is evidence in the record, which the verdict indicates the jury believed, that the Lindsey car first collided with the Elkins car, at which time Lindsey received his injuries. The acts of the tort feasors in *Young v. Dille, supra,* were independent of each other, and did not unite in causing the injury to the plaintiff, distinguishing that case from the case at bar where the acts of Elkins and Sidel united in forming a barricade which was the proximate cause of the injury to the respondent.

In *Young v. Dille, supra,* the automobiles of plaintiff Young and defendant Dille collided, driving plaintiff's automobile against the curb on the opposite side of the street. While the plaintiff was dazed and unable to extricate himself from the wrecked car, an oil truck

was driven into the wrecked automobile, although the driver of the oil truck could have seen the plaintiff's helpless situation "when at a distance of one hundred and fifty feet away, and had ample time to avoid striking him either by stopping the truck or passing him to the left." We there said:

"The cause seems to have been tried in the court below on the theory that the defendants Dille and Harris were joint tort feasors. But it seems to us manifest that they were not such, either if the facts be considered from the allegations of the complaint or by the proofs shown at the trial. *To be joint tort feasors, the parties must either act together in committing the wrong, or their acts, if independent of each other, must unite in causing a single injury.* Neither of these conditions were here present. The allegations and the proofs are that Dille by one act of negligence caused the appellant certain injuries, and, that Harris, after the commission of this act of negligence, by an independent act of negligence caused him further and additional injuries. The acts have no relation to each other except nearness in time. But time is not a determinative consideration. If the acts were not joint in fact, or, if the acts do not unite in causing a single injury, they are as widely separated in law by the lapse of a moment as they would be were they separated by the lapse of hours or days. Plainly, under the conditions here shown neither of the actors in the wrong could be responsible for the injuries caused by the other." (Italics ours.)

In *Cleveland etc. R. Co. v. Hilligoss,* 171 Ind. 417, 86 N. E. 485, the rule is stated in the following language:

"When more persons than one unite in the commission of a wrong, each is responsible for the acts of all, and for the whole damage; also, where separate and independent acts of negligence by different persons concur in causing a single injury, each is fully responsible for the trespass. Courts will not undertake to apportion the damages in such cases among the joint wrongdoers."

Section 35 of chapter 96 of the Laws of 1921, p. 276; Rem. Comp. Stat., § 6347, was amended by chapter 105, Laws of 1927, p. 91; Rem. 1927 Sup., § 6347, to read as follows:

"It shall be unlawful for any person to leave any vehicle standing upon the main traveled portion of any highway of this state outside of any incorporated city or town: . . ."

By parking on the highway, Sidel violated the statute and was guilty of negligence. When Elkins stopped his car parallel with the car of Sidel, he united with Sidel in forming a barricade. Both were guilty of negligence.

"The rule is that, when he violates the law of the road, he must exercise a higher degree of care than otherwise, and if injury results from his failure to observe the statute, that failure will constitute negligence *per se.*" *Duggins v. International Motor Transit Co.,* 153 Wash. 549, 280 Pac. 50.

Sidel's violation of the law of the road in parking on the highway and his utter lack of care in failing to have lights on his car, and the negligence of Elkins in stopping his car alongside of the parked car united in causing the injury to Lindsey; therefore Sidel and Elkins are jointly liable. An analogous case in which the rule is applied is *San Marcos Electric Light & Power Co. v. Compton,* 48 Tex. Civ. App. 586, 107 S. W. 1151. In that case an electric company maintained one of its poles on a street about six inches from the outer edge of the sidewalk. A telephone company had placed a guy wire on the top of the pole, which extended across the live wires strung thereon, and hung to within a few feet of the ground. The wire became charged with the current and caused the death of a person placing his hand on it. The holding was that the telephone company, in attaching the guy wire and in allowing

it to remain in a dangerous position, and the electric company, in not removing the wire, were each guilty of negligence, which was an efficient cause of the entire injury, and were each liable to the full extent of the injury. The court said:

"In this case the verdict finds that both defendants were guilty of gross negligence. We may concede, as contended on behalf of the electric light and power company, that it did not participate with the other defendant in the active wrong of connecting the guy wire with the post; but inasmuch as the law placed upon it the duty to remove the wire from the post, and as it neglected to do so for such length of time and under such circumstances as to render it guilty of gross negligence, we think it should be treated as, in effect, ratifying and adopting the wrongful act of its co-defendant. At any rate, from the verdict we must hold that it was its duty to remove the guy wire from the post in order to prevent injury to third persons, and, not having discharged that duty, it should be held responsible to the full extent of such injury. As to the telephone company, it should be held responsible in like manner, and to the same extent, on account of its original wrong in attaching the guy wire to the post and permitting it to remain there. When the law imposes a duty, performance of which will prevent any injury, damages recoverable for nonperformance of such duty should be in proportion and to the extent of the injury sustained. If it be conceded that the negligence of each defendant was separate and distinct and that they were not joint tort-feasors, nevertheless, as the negligence of each was an efficient cause of the entire injury, each must be held liable to the full extent of the injury."

The respondent sought recovery from all of the defendants for their concurrent negligence in forming a barricade. The negligence charged against Sidel was parking car, unlighted, on traveled portion of highway in violation of the statute. Negligence charged against Elkins was in stopping his car alongside the parked car of Sidel. The injury to respondent was the

result of the combined negligence of Sidel and Elkins. Their united negligence was the proximate cause of the collision. As said by former Chief Justice Ellis, speaking for the court, in *Hellan v. Supply Laundry Co.,* 94 Wash. 683, 163 Pac. 9:

"There may be more than one proximate cause for the same injury. The negligence of different persons, though otherwise independent, may concur in producing the same injury. In such a case, all are liable. They may be held either jointly or severally. The negligence of one is no excuse for that of another.

" 'If the damage has resulted directly from concurrent wrongful acts or negligence of two persons, each of these acts may be counted on as the wrongful cause, and the parties held responsible, either jointly or severally, for the injury. It is well settled by the adjudged cases that when an injury is the result of the combined negligence of the defendant and the negligent or wrongful act of a third person, for whose act neither the plaintiff nor the defendant is responsible, the defendant is liable, when the injury would not have happened except for his negligence. Thus, if two persons wrongfully block up a street, so that one is injured in attempting to pass them, neither of the culpable parties can excuse himself by showing the wrong of the other, for the injury is a natural and proximate result of his own act under the then existing circumstances and to excuse either would be to deny all remedy in the case of plain and palpable injury.' Cooley, Torts (3d ed.), pp. 119-123."

■ The text of Ruling Case Law respecting the attempt by juries to apportion damages among several tort-feasors reads as follows:

"There is some conflict as to whether a verdict against joint tortfeasors which assesses the damages severally can be cured or corrected. While there is some authority to the effect that such apportionment of damages is an essential part of the verdict which cannot be disregarded as surplusage and therefore no judgment can be entered thereon, it is generally held

that the irregularity is not fatal and may be cured by amendment or correction. The question as to the manner in which the irregularity of a verdict severing the damages found against joint tortfeasors may be cured arises in two different ways, according to the form in which the verdict is rendered. Thus where the verdict is that the plaintiff recover of the defendants a certain sum, followed by an apportionment of such damages among the several tortfeasors, this fixes the plaintiff's right to recover the full amount against the guilty parties, and the trial court may receive the verdict and amend it by striking out as surplusage all after the finding of the joint liability, or it may return the verdict to the jury for correction. Where a several judgment is rendered against each defendant on such a verdict, it is not necessary to enter a reversal because of the erroneous form in which it was entered, since it can be corrected by a direction of either the appellate or trial court, making the judgment conform to the established rule in such cases. But a different question is presented where the jury simply assesses damages against each of the defendants, in which event the decisions indicate two methods of curing the irregularity. According to one line of cases, the plaintiff may elect his best damages and enter judgment for such sum against all the defendants found guilty jointly. The reasoning on which such practice is based is that the damages assessed against one being the finding of the jury as to the damages which the plaintiff has sustained, the law draws the inference that all the joint tortfeasors are liable for such sum. While a remittitur may be entered of the smaller sum or sums found, such entry has been held to be only a matter of form, the entry of a joint judgment against all for the larger sum being *per se* an election to take judgment against all and for that sum only. According to another line of decisions, however, where the jury merely assess several damages against joint tortfeasors, the plaintiff may select which one he will take judgment against, and enter a *nolle prosequi* as to the others. The reason assigned for this is that, as such actions are several as well as joint, and as the plaintiff might therefore

have originally commenced his action against one only, and proceeded to judgment and execution against him, so he may, after verdict against several, elect to take his damages against either of them." 27 R. C. L., p. 893, § 66.

We shall not review all of the authorities cited by counsel. We announced in *Martin v. Nichols,* 110 Wash. 451, 188 Pac. 519, the rule which was reiterated in *Pearson v. Arlington Dock. Co.,* 111 Wash. 14, 189 Pac. 559, that an attempt by the jury to segregate or apportion the damages should be disregarded as surplusage.

In *Martin v. Nichols, supra,* the verdict was as follows:

" 'We, the jury, duly empaneled and sworn to try the issues of the above entitled cause, find for the plaintiff in the sum of $725.00 Dollars. Administrators fees left for court to decide.' "

The appellant there argued that the words "Administrators fees left for court to decide," made the verdict ambiguous and that the court erred in accepting it. We said:

"In any event, the words referred to are no more than surplusage which does not vitiate, and the court was right in disregarding them."

In *Pearson v. Arlington Dock Co., supra,* the verdict was as follows:

" 'We, the jury in the above entitled cause, do find for the plaintiff and against both defendants in the sum of $3,750 each Arlington Dock Co., North Coast Stevedoring Co., Dollars ($7,500).' "

In that opinion it is stated:

"While the verdict is somewhat awkward, it is perfectly plain that the jury meant to find a verdict of $7,500 for the plaintiff against both defendants, each defendant to pay one-half of that amount. The jury did not have any right to segregate this amount and

make each defendant liable for a portion thereof, consequently that portion of the verdict where the jury undertakes to do so must be considered surplusage."

It is clear that, in the case at bar, the jury intended to find a verdict of thirty-five hundred dollars for the respondent—the verdict so reads:

"We, the jury in the above-entitled cause do find for the plaintiff in the sum of three thousand five hundred dollars."

It was without the province of the jury to apportion the damages, therefore that part of the verdict where the jury attempts to do so is considered surplusage.

The cited case of *Bino v. Veenhuizen,* 141 Wash. 18, 250 Pac. 450, is not apposite. There the verdict reads:

" 'We, the jury in the above entitled cause, do find for the defendant. Not guilty.' "

The trial court considered the verdict defective because it contained the words "Not guilty," and sent the jury back to correct the verdict. The jury, being unable to agree, were discharged from further consideration of the case. The appellant moved the court to enter judgment upon the verdict which had been brought in by the jury and which the court, deeming informal and defective, had sent back for correction. The motion was denied. We held that the court could not thereafter enter judgment upon the verdict because *it was never received by the court as the final verdict of the jury in the case.*

■ Appellant assigns as error the refusal of the court to give to the jury certain requested instructions. Appellant did not except to the instructions given by the court.

Instruction No. H requested by appellant reads as follows:

"The court instructs the jury that, under the law of the state of Washingon,

"Every vehicle when upon any public highway within this state during the period from a half hour after sunset to a half hour before sunrise and at any other time when there is not sufficient light to render clearly discernible a person, vehicle or other substantial object on the highway at a distance of two hundred feet ahead shall be equipped with lighted lamps and/or lighted headlights as herein respectively approved for this class of vehicles and subject to such exceptions as are set forth in this act.

"The headlights of motor vehicles shall be so constructed, arranged and adjusted that they will at all times mentioned in this act and under normal atmospheric conditions produce ample driving light for use of the operator of such vehicle but will not project a glaring or dazzling light to persons approaching such lights or to persons whom such headlights may approach. Headlights shall be presumed to comply with the provisions of this section:

"(a)   When the vehicle upon which they are affixed is fully loaded;

"(b)   When such headlights are affixed to such vehicle in the manner required by this act;

"(c)   When they are of a type or are equipped with lens reflectors or control device upon which certificate of approval has been issued by the commission on equipment as provided in this act;

"(d)   When used in accordance with the instructions contained in or accompanying such certificate;

"(e)   And when the light projected by such headlights shall be as follows:

"(1)   In the median vertical plane, parallel to the lamps on a level with the centers of the lamps not less than one thousand eight hundred nor more than six thousand apparent candle-power.

"(2)   In the median vertical plane, one degree of arc below the level of the center of the lamps, not less than seven thousand two hundred apparent candle-power and there shall not be less than seven thousand two hundred apparent candle-power anywhere on the horizontal line through this point one degree to the left or to the right of this point.

"(3)   In the median vertical plane, one degree of arc above the level of the center of the lamps, not more than two thousand four hundred nor less than eight hundred apparent candle-power.

"(4)   Four degrees of arc to the left of the median vertical plane and one degree of arc above the level of the center of the lamps nor more than eight hundred apparent candle-power.

"(5)   One and one-half degrees of arc below the level of the center of the lamps and three degrees of arc to the left and to the right respectively of the median vertical plane not less than five thousand apparent candle power nor less than this amount anywhere on the line connecting these two points.

"(6)   Three degrees of arc below the level of the center of the lamps and six degrees of arc to the left and to the right respectively, of the median vertical plane not less than two thousand apparent candle-power nor less than this amount anywhere on the line connecting those two points.

"And if you find from the evidence in this case that the automobile in which plaintiff was riding was not equipped with headlights as required by law, this would be negligence of the driver of the car; and if you find that the plaintiff in this case concurred in said negligence and you find that the failure to have proper lights was the proximate cause of the collision, if any, then I charge you that your verdict must be for the defendants."

By instruction No. 10 the court told the jury:

"Now, whether Flannigan was guilty of negligence or not depends upon whether and how he has observed the rules of law required of drivers in similar cases.

"Every vehicle upon the public highway, between half an hour after sunset and a half hour before sunrise, shall be equipped with lighted headlights which shall be so constructed, arranged and adjusted that they will, at all times, under normal atmospheric conditions, produce sufficient light to render clearly discernible an object on the highway a distance of 200 feet.

"The law does not require, under atmospheric conditions that are not normal, that the headlights of an automobile shall illuminate the road for 200 feet ahead, or any other definite or fixed distance ahead. The law only imposes the duty of having burning headlights which conform to certain specifications and under normal atmospheric conditions, and if, because of abnormal atmospheric conditions, headlights otherwise legal do not illuminate objects ahead for such distance, this fact does not prohibit the driving with such lights under such illumination, but does require the driver of such car, while driving under such atmospheric conditions, to exercise reasonable care commensurate with such atmospheric conditions. A driver on the highway has a right to presume that drivers ahead will not unlawfully stop within the improved portion of the highway, and he may indulge such assumption unless and until he sees, or in the exercise of reasonable caution on his part should see, appearances to the contrary.

"While the maximum rate of speed provided by law is forty miles per hour, yet a driver should at all times operate his car at such a reasonable rate and have it under such control as an ordinarily prudent, cautious driver, under the circumstances, would do.

"The law recognizes that men are often confronted by and must act in emergencies. When a man is suddenly confronted by an emergency not due to negligence on his own part, he, if he acts as a reasonably prudent person under the circumstances would act, cannot be charged with negligence because in such emergency he may not have done that which now can be seen would have prevented an accident. It is not a question of what was the safest or best thing to do, but the question is what, under the circumstances, would a reasonably cautious and prudent person have done."

Counsel for appellant argue:

"In this case we requested the statutory law on headlights and we had a right to have it given. This the court refused to do and it was a clear error for the court to give its own version of what the headlight law

was and especially in view of the fact that the instruction was contrary to the statute."

It is proper for the court to instruct in the language of the statute but it is not required to do so.

"Without assembling the cases, it may be said that it has been many times held that it is not error to refuse to give requested instructions which correctly state the law and are applicable to the facts in the particular case, when the subject-matter of the requested instructions is covered in the instructions given. In other words, even though the requested instructions were proper to be given, it is sufficient if the same subject-matter is covered in the charge, even in briefer form and in different phraseology." *Engstrand v. Hartnett,* 106 Wash. 404, 180 Pac. 132.

"It is not the rule that every requested instruction which could be properly given must be given. If the jury are properly and fully instructed upon the controlling principles of law involved the rule is satisfied." *Ziomko v. Puget Sound Elec. Co.,* 112 Wash. 426, 192 Pac. 1009.

"In this state the court is not obligated to give requested instructions in the language of the request. The court may use its own language in instructing the jury, and, if it covers the issues fully and fairly, it does not err, even though it may refuse to give a requested instruction which could properly have been given." *Nicolle v. United Auto Transportation Co.,* 138 Wash. 48, 244 Pac. 127.

The language of the statute is technical, and, if the instruction given had been a verbatim copy of the statute, would not have been more informative than the instruction given in the language of the court, language that the average person could understand. The jury were instructed that the law required the respondent's automobile to be equipped with headlights so adjusted that, under normal atmospheric conditions, an object would be rendered clearly discernible on the highway two hundred feet distant. That is the substance of the

statute. To recite to the jury specifications of the statute as to the candle-power, light projection and other items of that character, would not render more intelligible to the jury the requirements of the statute that the headlights must be such that an object could be seen two hundred feet therefrom under normal atmospheric conditions. The average person would not be enlightened, but would be confused by the technical terms of the statute. Many of the authorities cited hold that it is excellent practice to follow the statute in framing instructions, but do not hold that it is mandatory that the instructions shall be in the very language, word for word, of the statute. The instructions given by the court covered the law respecting headlights as applicable to the case at bar.

Appellant next complains of the court's refusal to give requested instruction No. J. By that instruction, the appellant requested that the question whether the accident was unavoidable be submitted to the jury. Respondent's only charge of negligence against appellant was the standing of his car on the highway in violation of the statute. If Elkins' car was standing on the highway as alleged, his negligence contributed to the accident. The theory of appellant that the collision was caused by the unlawful speed of the Lindsey car was not accepted by the jury. There were no facts from which the jury could find that the accident was unavoidable. The court properly refused to give the instruction as it was inapplicable to the facts in evidence.

The court refused to give appellant's requested instruction No. H. The substance of that instruction is that, if the jury are unable to determine what was the cause of the injury to Lindsey or in what respect the defendants were negligent, then the jury should find for the defendants. Respondent charged appellant

with negligence in permitting his car to stand on the highway. The jury were instructed by the court that, if they found appellant's car was not stopped, but was moving at the time of the collision, then their verdict must be in favor of the appellant Elkins. The jury were also instructed that, before Lindsey could recover against any of the defendants, the burden was upon him to establish by the greater weight of credible evidence that such defendant was guilty of negligence in some one or more of the particulars charged and that such negligence was the cause of respondent's injury. The court defined the particular negligence charged against each defendant, and set forth that the only act of negligence charged against Elkins was that he brought his car to a stop on the highway and permitted it to remain standing thereon. The jury were limited to finding Elkins guilty of the one act of negligence or returning a verdict in his favor. The court properly refused to give the requested instruction.

Appellant Elkins' requested instruction No. M, which the court refused to give, reads as follows:

"You are instructed that a driver should operate his vehicle at such a rate of speed and should have the same under such control as to enable him, in the exercise of ordinary care, to bring his car to a stop within a distance at which an object ahead on the straight and unobstructed highway becomes discernible and plainly disclosed by the headlights with which the motor vehicles are required to be equipped by the laws of this state."

By this instruction, the jury were told that a driver must have his car under such control as to be able to stop within the range of vision produced by his headlights. In *Morehouse v. Everett*, 141 Wash. 399, 252 Pac. 157, in which the authorities are reviewed, we rejected the unqualified rule that a driver must have his

car under such control under all circumstances that he could stop within the range of vision produced by his headlights. The late Judge Bridges, speaking for the court, said in that case:

"This supposed rule of 'drive within the radius of your lights' has been advanced in other cases in this court. It is here asserted, and has likewise been argued in other cases, that many of the courts have held that one driving an auto at night must, under all circumstances and as a matter of law, see whatever obstructions that are within the radius of his front lights, and must operate his car at such speed and have such control over it that he can stop it before striking the obstruction, and that, under these circumstances, he cannot recover, even though the defendant has negligently placed the obstruction or barrier in the road, or, if he has lawfully placed it there, has negligently failed to give notice of its presence by placing thereon red lights or other proper or sufficient warning. If such a rule has been announced by other courts, we cannot follow it, for reasons which we will give after first reviewing some of the cases which are said to support it. The doctrine is supposed to have been first announced in *Lauson v. Town of Fond du Lac,* 141 Wis. 57, 123 N. W. 629, 25 L. R. A. (N. S.) 40. . . . We seriously doubt whether this case, which is the leading one, supports the rule contended for. If this opinion means that one driving an automobile at night must, under all circumstances, see any object in the road in front of him which comes within the radius of his lights, and be able, under all circumstances, to stop his car before striking the object, then we are unable to agree with it. On the contrary, if it holds that he must see any object which an ordinarily prudent driver under like circumstances would have seen, then we think it states the law correctly."

In harmony with the foregoing, the court instructed the jury:

"The law does not require, under atmospheric conditions that are not normal, that the headlights of an automobile shall illuminate the road for 200 feet ahead,

or any other definite or fixed distance ahead. The law only imposes the duty of having burning headlights which conform to certain specifications and under normal atmospheric conditions, and if, because of abnormal atmospheric conditions, headlights otherwise legal do not illuminate objects ahead for such distance, this fact does not prohibit the driving with such lights under such illumination, but does require the driver of such car, while driving under such atmospheric conditions, to exercise reasonable care commensurate with such atmospheric conditions. . . . While the maximum rate of speed provided by law is forty miles per hour, yet a driver should at all times operate his car at such a reasonable rate and have it under such control as an ordinarily prudent, cautious driver, under the circumstances, would do.''

The appellant was not entitled to a more favorable instruction than that given by the court. The vice inhering in the requested instruction is the attempt to lay down an absolute and unqualified rule which, if applied, would not only impede but stop traffic on the highway in foggy, misty or rainy weather. The court correctly refused to give the requested instruction.

■ Requested instruction No. S, which the court refused to give, is to the effect that the jury must not be governed by sympathy or prejudice. Our examination of the record fails to disclose aught from which sympathy or prejudice would necessarily arise. Elkins is not now complaining of the amount of damages. Appellant's counsel argue that the jury endeavored to protect appellant Elkins against being required to pay the larger part of the damages found to have been sustained by the respondent. This repels the suggestion that the jury were swayed by sympathy or prejudice. It is within the discretion of the court whether or not to give such an instruction.

''It is not improper to instruct the jury that they are not to be influenced by sympathy or prejudice, if

the circumstances warrant it. The giving or refusal of such instructions is, however, ordinarily a matter of discretion with the court. The parties are certainly not entitled to a cautionary instruction of this character in the absence of special circumstances connected with the trial, which would make such instruction essential to a fair trial.'' 38 Cyc. 1759.

*Wheeler v. Hotel Stevens Co.*, 71 Wash. 142, 127 Pac. 840, Ann. Cas. 1914C 576, cited by appellant, is not out of harmony with the rule quoted. In that case it is stated:

''The trial judge may, and where there is a seeming necessity should, caution the jury not to allow sympathy or prejudice to influence their verdict.''

From our examination of all of the instructions given, which must be considered as a whole, we conclude that they cover the issues made by the pleadings and the evidence, and contain a correct statement of the law as applicable to the facts presented upon the trial.

Appellant's motion for a new trial upon the ground of misconduct of the jury was denied. In support of the motion, the appellant submitted affidavits of three attorneys and the unsworn statements of two of the jurors.

The statements of the jurors are to the effect that one of their number informed them during their deliberations that she had driven out to the scene of the accident during the noon hour and that she did not see any marks upon the pavement.

The affidavit of one of the attorneys avers that one of the jurors informed him by telephone that the jury did not intend to find against Elkins for more than fifteen hundred dollars, and that one of the jurors, during the noon hour, without leave of court, personally visited the scene of the accident to ascertain

whether the marks testified to by Elkins were still visible on the pavement.

The affidavit of another of the attorneys is to the effect that he was in the office of the first attorney and overheard the conversation between the attorney and one of the jurors, and that during the conversation the attorney repeated over the telephone to the juror the information the juror had just given him.

The affidavit of the third attorney is that the two jurors told him the same story narrated above of the visit by one of the jurors to the scene of the accident.

The misconduct of a jury cannot be proved by unsworn statements.

"The statute authorizing the use of affidavits in support of the motion for a new trial (Rem. & Bal. Code, § 401; P. C. 81, § 733), reads:

" 'The motion for a new trial shall state the grounds or causes for which a new trial is asked, and if made for any of the causes mentioned in the first, second, third or fourth subdivision of § 399, the facts upon which it is based may be shown by affidavit.'

"The language employed, standing alone, seems to import a mere permissive use of affidavits; but when we examine the four indicated subdivisions of § 399 to which it is applied, the word 'may' must be construed in a mandatory rather than a permissive sense whenever affidavits may be used at all. The four subdivisions of Rem. & Bal. Code, § 399 (P. C. 81, § 729), are as follows:

" '(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial;

" '(2) Misconduct of prevailing party or jury; and whenever any one or more of the jurors shall have been induced to assent to any general or special verdict, to a finding on any question or questions submitted to the jury by the court, other and different from his own conclusions, and arrived at by a resort to the determi-

nation of chance or lot; such misconduct may be proved by the affidavits of one or more of the jurors;

" '(3) Accident or surprise which ordinary prudence could not have guarded against.

" '(4) Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial.'

"It will be noted that some of the situations contemplated by the first three of the grounds for a new trial might arise upon matters occurring in open court during the progress of the trial, and the facts would then appear as a part of the record. In such a case, it is obvious that affidavits presenting such facts would be unnecessary and improper. Other situations contemplated by any one of these four subdivisions might arise out of matter not occurring in open court during the progress of the trial, and hence not appearing in the record. In such a case, evidence *aliunde* the record would be not only proper but necessary to any disclosure of the facts relied upon for a new trial. The statute, recognizing this necessity, permits that evidence to be supplied by affidavits, the permissive form of expression being used because evidence *aliunde* the record itself would not always be necessary. *Where such evidence outside of the record is necessary at all, this statute authorizes no other means of presenting it than by affidavits. It follows that, in such cases, the motion for a new trial not only may be supported by affidavit but must be so supported.* A thoughtful reading of § 401, in connection with the grounds for a new trial to which it refers, is convincing that, where the facts upon which the motion rests do not appear in the record as a part of the trial itself, the discretionary powers of the trial court can only be invoked by presenting such facts by affidavit. Though this court has never before stated the reasons for construing the statutory use of affidavits as mandatory rather than permissive, it has in at least two decisions assumed the presentation of facts by affidavit essential. *Lybarger v. State,* 2 Wash. 552, 27 Pac. 449, 1029; *State v. Parker,* 25 Wash. 405, 65 Pac. 776." *Maryland Cas-*

*ualty Co. v. Seattle Elec. Co.,* 75 Wash. 430, 134 Pac. 1097. (Italics ours.)

Unless the appellant's motion for a new trial on the ground of misconduct of the jury was supported by affidavits, the motion should have been denied. The unsworn statements of the two jurors are not sufficient to support the motion. Supporting affidavits being necessary, do the affidavits of the attorneys reciting what they were told by a number of the jurors satisfy the rule? Manifestly not. The affidavits are nothing more than hearsay statements and such affidavits are not sufficient to invoke the discretion of the trial court to grant a new trial.

"Whatever the breadth of the application of the rule as to the inadmissibility of the affidavits of jurors to establish their misconduct, it is almost universally held that affidavits of third persons as to unsworn statements of jurors tending to show either the fact of misconduct or its effect upon the verdict cannot be received for any purpose because they are of a purely hearsay character.

" 'Numerous affidavits setting forth these transactions were presented to the court. An examination of them shows that all the statements therein contained are pure hearsay, consisting of the conversations had by the affiants with some of the jurors, or declarations made by jurors in their presence. There is no pretense that the prevailing party in the action knew of or had anything whatever to do with the alleged misconduct of the jurors, or that the jurors or either of them, were approached or improperly influenced by any person. There are no facts in regard to this assignment that would authorize this court to interfere with the order of the court below denying a new trial. Statements made by jurors not under oath, after the trial is over, are not competent evidence.' *Walton v. Wild Goose Mining & Trading Co.,* 123 Fed. 209, 221." *Maryland Casualty Co. v. Seattle Elec. Co.,* 75 Wash. 430, 134 Pac. 1097.

We reiterated the rule in *Johnson v. Smith*, 118 Wash. 146, 203 Pac. 56, where the affidavit of a third person based upon the unsworn statement of a juror to him after the trial respecting misconduct of a juror in the jury room was held insufficient to support a motion for a new trial. We said:

"The motion for a new trial was denied notwithstanding two affidavits on behalf of the appellant. One of them was by one of the attorneys for the appellant to the effect that several of the jurors stated to him that another juror told the jury, while they were in consultation, that he had attempted to open the door to the basement of the Smith building in which the plaintiff was injured mistaking it for the true entrance and that such statement was considered by the jury in deliberating upon their verdict. Such an unsworn statement of a juror to an outsider is, upon grounds of public policy, not competent evidence to show misconduct of the jury."

The assignment is without merit for another reason. The affidavits alleging the misconduct of the jury as ground for a new trial appear in the clerk's transcript but are not included in the statement of facts. When the affidavits are not attached to, or made a part of, the statement of facts, they will not be considered on appeal. We have uniformly applied the rule, therefore deem it unnecessary to cite our numerous decisions announcing and reiterating the rule.

Equally without merit is the assignment of misconduct of counsel for respondent in seeking by prejudicial remarks to influence the jury.

The judgment is affirmed.

PARKER, FRENCH, MAIN, and BEALS, JJ., concur.